**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**JULIA A. DENSON,**

      **Plaintiff,**

**vs.**                               **Case No. 4:10cv278-SPM/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

_____/


**REPORT AND RECOMMENDATION**

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).   It is recommended that the decision of the Commissioner be reversed and remanded.

**Procedural status of the case**

Plaintiff, Julia A. Denson, applied for disability insurance benefits and supplemental security income benefits.  Her last date of insured status for disability benefits was September 30, 2007.  Plaintiff alleges disability due to thyroid disorder, congestive heart failure, degenerative disc disease, and depressive disorder, with onset

on September 17, 2005, for disability insurance benefits, and onset on January 22, 2006, for supplemental security income benefits (one year prior to date of the filing of the application).  Plaintiff was 49 years of age on December 9, 2009, the date of the administrative hearing, has a 12th grade education with some community college credits, and passed a state test for working as a file clerk and in accounting.

The Administrative Law Judge found that Plaintiff has past relevant work as a hand packager, an office clerk, routine, and in the seafood and delicatessen departments of a grocery store.  The Administrative Law Judge found that Plaintiff had the residual functional capacity to do a limited range of sedentary work, can still do her past relevant work as a hand packager, and an office clerk, routine.  Using the "grids,"[1] the ALJ also determined at step five that Plaintiff can do other sedentary work.  For both reasons he concluded that Plaintiff was not disabled.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir.

---

[1] Appendix 2 to Subpart P of Part 404 – Medical-Vocational Guidelines, found at: http://www.ssa.gov/OP_Home/cfr20/404/404-ap11.htm

2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.   Is the individual currently engaged in substantial gainful activity?

2.   Does the individual have any severe impairments?

3.   Does the individual have any severe impairments that meet or
     equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.   Does the individual have any impairments which prevent past
     relevant work?

5.   Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**

Plaintiff testified that after high school, she took courses at a community college

in filing and career planning, and passed a state test for file clerk and accounting jobs.

R. 35-36.  She said that she "most definitely" can read and write, and owns a car.  R. 36.  She said she had not driven in the last three years because she felt weak and dizzy due to her heart problems, and her legs would swell up.  R. 37-38.  She said she now takes the bus.  R. 38.  She said she was 5' 8" and weighed about 160 pounds.  R. 39.

Plaintiff said that the last time she worked was on September 17, 2005, for Winn-Dixie grocery store in the seafood department.  R. 40-41.  She did part-time work there for about five years.  R. 41.  She said she put seafood on trays and cleaned, among other duties.  *Id*.  This was a job that required a lot of standing.  R. 44.  She also worked three days at the customer service desk.  R. 42.  She was restricted in these jobs to lifting only light weights, less than 10 pounds.  R. 43.  She also worked six months in the delicatessen and six months as a cashier for Winn-Dixie.  R. 77.  That work also was primarily a standing job.  R. 78.

She said that she did office clerical work on assignment by Manpower.  R. 44-46.  She said that she worked two months in some of these jobs, a week or two in others, and in one job, at Radiation Control, she worked five months.  R. 46-47.  Each was temporary work, but a full-time job while she did it.  R. 46.  She said that these were sedentary clerical jobs.  R. 48.

Plaintiff testified that the hand packager job was a part-time job at Goodwill, stuffing envelopes, and was performed as a sedentary job.  R. 83.  She did the job for a month.  *Id*. and R. 54, 83.

Plaintiff testified that she was able to dress and bathe herself, and to attend to her personal hygiene.  R. 55.  She could make sandwiches and salads for herself, and

use the microwave.  *Id.* and R. 60.  She said she could not stand for a long period due to her lower back.  R. 55.  She said she could stand for about 15 minutes before she had to sit.  R. 56.  She said she needed help to shop for groceries, and sometimes has to sit while someone else does the shopping.  R. 57, 59.  She said she can do laundry, but can hang up only a few items to dry.  R. 61.  She said she can sweep the floor and dust to some extent.  R. 62.

Plaintiff said there came a point, in about October, 2008, when she quit taking her medications (for blood pressure, thyroid problems, and water retention) for about a year.  R. 66-67.  She said she was sick during that period, and went into a deep depression.  R. 67.  She had restarted taking the medications the next October, but said she felt a bad pain in her chest, and that she had heart palpitations.  R. 69.

Plaintiff said that she cannot work because of the pressure in her chest, muscle spasms in her lower back, dizziness, and shortness of breath.  R. 69.  She said that the feeling was like asthma and the "air is not going in."  *Id.*  She said she has these feelings every day.  R. 73.  She had been sitting about an hour during the hearing, and she said she still felt bad.  R. 75.  She said she could sit for 5 minutes without having to stand up.  *Id*.

The vocational expert addressed one of Plaintiff's former jobs as an office clerk, routine, for Manpower.  R. 81.  He said that the job ordinarily required an ability to do light work, but was performed by Plaintiff at the sedentary level and had a specific vocational preparation (SVP)[2] of 4.  *Id.*  He said that the work Plaintiff performed at a

---

[2] "The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled

grocery store in the seafood department required the ability to do light work and perform at an SVP level of 3 to 4.  R. 81-82.  Plaintiff's work as a cashier, checker, was a light work job, SVP 3.  R. 82.  Finally, the vocational expert said that Plaintiff's work as a hand packager for Goodwill, SVP 2, was performed at the sedentary exertional level. *Id.* and R. 83.

The vocational expert was asked to assume that Plaintiff was capable of performing sedentary work, lift and carry up to ten pounds, stand or walk up to two hours a day, had limited ability to push or pull, and can only "perform simple, routine, repetitive tasks, commonly defined as one to two-step tasks, and would be able to concentrate and persist for two-hours segments [sic], take a short break, . . . and then continue."  R. 84.  The vocational expert said that with those limitations, Plaintiff could not return to work in the seafood department, but could do the work of hand packager as she performed it, and the job of office clerk, routine.  R. 85.  He said that a great deal of the work, as performed, would be routine and less than SVP 3.  R. 85-86.

The vocational expert said, however, that if Plaintiff's claimed inability to do any work were credible, there would be no work in the national or local economies that she could do.  R. 86.  He also said that if Plaintiff's ability to do sedentary work were limited to no more than 20 hours a week, there would be no work that Plaintiff could do.  R. 86-87.

---

work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  *See* SSR 00-4p, available at 2000 WL 1898704.

**Medical evidence**[3]

Plaintiff had surgery for right carpal tunnel syndrome by Albert S. Lee, M.D., on May 2, 2005.  R. 286.  She was seen again by Dr. Lee on June 3, 2005, reporting continued pain in her right index and middle finger, which she rated as 9 out of 10.  R. 293.  She also said she had pain radiating up her forearm.  *Id*.  Plaintiff said she could not work and could not use her right hand to carry anything.  *Id*.  On examination, Dr. Lee found that she had some giveaway weakness in her right hand.  *Id*.  He determined that she continued to suffer from pain and numbness in the media nerve distribution of her right hand.  *Id*.  He found this to be somewhat unusual as her right thumb was spared and her middle finger was more involved than he would expect, but she did not have any gross weakness of her hand.[4]  *Id*.  Plaintiff did not want to return to work due to her symptoms.  *Id*.  Future occupational therapy was planned.  *Id*.

On July 13, 2005, Dr. Lee released Plaintiff to work with limitations as to pushing, pulling, carrying, grasping, hand dexterity, reaching overhead, lifting, and operating

---

[3] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at < http://www.pdrhealth.com/drugs/drugs-index.aspx >. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS, available at:  http://www.mercksource.com (Medical Dictionary link) or MEDLINE PLUS, found at www.nlm.nih.gov/medlineplus/mplusdictionary.htm.  Social Security Rulings can be found at:  http://www.ssa.gov/OP_Home/rulings/rulfind1.html.   The pages at these websites are not attached to this report and recommendation as the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

[4] The medical note refers to "head," but the context suggests that Dr. Lee meant "hand."

heavy equipment.  R. 371.  She had no limitations for standing or sitting.  *Id*.  She was not yet at maximum medical improvement.  *Id*.

On September 13, 2005, Plaintiff told Dr. Lee that she had pain in the dorsum of her right wrist and an aching pain when she rotated her lower arm, mainly in the forearm.  R. 298.  Dr. Lee found that the incision in the palm of Plaintiff's hand had healed well, and she had good strength, though she was "pain limited."  *Id*.  He found a "palpable soft mass" present in "the dorsum of her right wrist" that was tender to touch. *Id*.  She also had tenderness to palpation of her right forearm.  *Id*.  He noted that she had completed an MRI of her cervical spine to rule out cervical disc herniation.  *Id*.  The cervical spine MRI on September 12, 2005, had revealed some disc desiccation and some disc bulges, but overall the impression was minimal degenerative disease.  R. 288-289.  Dr. Lee said that the MRI did "not demonstrate any acute disk herniation, nerve root compression, or spinal cord compression," though "diffuse spondylotic changes" were present throughout her spine.  R. 298.

The next medical note is a year later, on November 6, 2006.  Plaintiff was treated in the emergency room for right foot swelling and pain through her upper leg, vomiting, and shortness of breath.  R. 245.  She had run out of blood pressure medication.  *Id*. She was found to have 1-2+ pedal edema.  R. 246.  An EKG revealed sinus tachycardia, possible left atrial abnormality, and left ventricular hypertrophy.  R. 249. The discharge diagnosis was tachycardia and hyperthyroidism.  R. 248.

On December 5, 2006, Plaintiff again went to the emergency room complaining of swelling in her lower extremities and vomiting.  R. 240.  Her blood pressure was

195/71, and her pulse was 98.  *Id.*  She said she had pain at level 10 in her left and right

legs.  *Id.*  Both legs were "very swollen" with 4+ edema, and she was unable to lift her

legs.  R. 242.  The EKG revealed left ventricular hypertrophy.  R. 244.

Plaintiff was treated at the hospital from January 10, 2007, to January 18, 2007.

R. 255.  Her admitting diagnosis was shortness of breath.  *Id.*  Her discharge diagnosis

was hyperthyroidism or Graves disease,[5] congestive heart failure, anemia, and other

problems.  R. 255.  Her heart x-ray revealed cardiomegaly.[6]  *Id.*  It was noted that she

had come to the emergency room with these symptoms in December, "but she did not

follow up as advised."  *Id.*  "Her orthopnea,[7] dyspnea on exertion, and edema were

worsening on this emergency room admission."[8]  *Id.*  Plaintiff had an ejection fraction of

20 to 30%, a sign of congestive heart failure, but it was thought that some of this was

due to hyperthyroidism that "she had likely had for a long period of time."  R. 256.  A

workup was recommended "to rule out coronary artery disease playing a role."  *Id.*

During the hospital stay, Plaintiff had one episode of "6-beat ventricular tachycardia,"

but she declined a recommendation that she undergo catheterization because she was

--------

[5] Graves's disease is a common form of hyperthyroidism characterized by goiter and often a slight protrusion of the eyeballs – called also Basedow's disease, exophthalmic goiter.  MEDLINE PLUS (MERRIAM-WEBSTER).

[6] Cardiomegaly is the abnormal enlargement of the heart from either hypertrophy or dilatation.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[7] Orthopnea is difficulty in breathing that occurs when lying down and is relieved upon changing to an upright position (as in congestive heart failure).  MEDLINE PLUS (MERRIAM-WEBSTER).

[8] On admission, it was noted that while Plaintiff had shortness of breath on exertion, she had no orthopnea or paroxysmal nocturnal dyspnea.  R. 258.

feeling better and planned to do this as an outpatient.  *Id*.  She was found to be "very childlike in nature."  R. 260.  The admitting physician, Dr. Hope, thought that Plaintiff required stabilization of her hypothyroidism "and she appears decompensated with cardiac effects likely secondary to hypothyroidism."  R. 261.  He thought that Plaintiff's lower extremity edema was secondary to congestive heart failure.  *Id*.

On January 31, 2007, Plaintiff saw Dr. Ernesto Umana in the outpatient clinic.  R. 275.  She said she was feeling better, but still occasionally felt a choking sensation in her throat and potential dyspnea if she tried to walk too fast.  *Id*.  She had lower extremity edema only if she tried to stand for a long time.  *Id*.  Dr. Umana noted 2+ pitting and non-pitting edema to the mid third of both tibial regions.  *Id*.  Plaintiff declined cardiac catheterization.  *Id*.  Diuretics were discontinued since she had no major edema.  *Id*.  Dr. Umana's assessment was cardiomyopathy,[9] hyperthyroidism, and hypertension.  *Id*.

On February 21, 2007, Plaintiff told Dr. Umana that she felt much better, and had improved energy.  R. 274.  Her dyspnea was much better and she was able to do most of her activities without having to stop.  *Id*.  She had occasional ankle edema when standing for a long time.  *Id*.  Her thyroid was enlarged.  *Id*.  Dr. Umana's assessment was cardiomyopathy, etiology still unclear, possibly related to her thyroid dysfunction or

---

[9] Cardiomyopathy is any structural or functional disease of heart muscle that is marked especially by enlargement of the heart, by hypertrophy of cardiac muscle, or by rigidity and loss of flexibility of the heart walls and that may be idiopathic or attributable to a specific cause (as heart valve disease, untreated high blood pressure, or viral infection).  MEDLINE PLUS (MERRIAM-WEBSTER).

hypertensive heart disease.  *Id.*  He also noted again that Plaintiff suffered from

hyperthyroidism and hypertension.  *Id.*

On March 15, 2007, Plaintiff was still doing well and was doing her activities

overall "with minimal problems."  R. 273.  One day when she had became upset she

had experienced an episode of breathing difficulty.  *Id.*  She had minimal edema.  *Id.*

Dr. Umana's assessment was the same as on the previous two visits.  *Id.*

On April 3, 2007, a non-examining state agency physician determined that

Plaintiff could perform sedentary work.  R. 302-309.

On May 8, 2007, Plaintiff reported to Dr. Umana that she was still doing well,

"without significant symptoms of shortness of breath," and no symptoms of chest pain.

R. 272.

On July 18, 2007, Plaintiff told Dr. Umana that since she had started thyroid

replacement therapy, her fatigue had improved, though she still felt "very tired."  R. 271.

She was still awaiting confirmation that her thyroid function was back to normal.  *Id.*  Her

lower extremity edema had improved, and she had no chest pain.  *Id.*

On August 21, 2007, Plaintiff was seen by Dr. Umana.  R. 358-359, 270.  Plaintiff

reported to Dr. Umana that she had not come in for follow-up because she had been

sick, "with significant nausea and vomiting."  R. 270.  She said she was having "chronic

hip and knee pain which makes ambulation difficult."  *Id.*  Her lower extremity edema

was still minimal.  *Id.*  Plaintiff denied that she experienced any significant dyspnea, and

was able to do all of her daily activities, though she was extremely tired and had no

energy.  *Id.*  She had no symptoms of orthopnea.  *Id.*  She had not obtained the

laboratory work-up as ordered, and was still awaiting confirmation that her thyroid function was back to normal. *Id.* Dr. Umana's assessment was again the same, noting that the cause of her cardiomyopathy could be either thyroid dysfunction or hypertensive heart disease. *Id.*

Also on August 21, 2007, Dr. Umana completed a form assessing Plaintiff's work limitations. R. 363. The diagnosis was cardiomyopathy. *Id.* He said that she could work for 11 to 20 hours a week, but must be restricted to lifting no weight greater than 20 pounds and no walking beyond one block, and he said that the duration of the restrictions was uncertain. *Id.* He said she could engage in other activities (classroom activities, volunteer work) 11 to 20 hours a week, but was limited by shortness of breath on exertion. *Id.* He thought that these impairments were probably permanent. *Id.* The Administrative Law Judge determined that this opinion was on a food stamp application form. R. 15.

On August 23, 2007, it was noted: "TMH [Tallahassee Memorial Hospital] lab normal." R. 357. Apparently this laboratory work concerned Plaintiff's thyroid function.

On September 12, 2007, Plaintiff was examined on a consultative basis by Wayne Sampson, M.D. R. 319. Plaintiff said that she suffered dyspnea after walking 50 yards, going up one flight of stairs, or lifting anything over 20 pounds. *Id.* She denied chest pain, orthopnea, or palpitations. *Id.* She said she had "intermittent, dull, non-radiating lower back pain for several years." *Id.* Dr. Sampson mentioned her prior medical history for cardiomyopathy, goiter, hypertension, and carpal tunnel release on the right. *Id.* Plaintiff said that she had intermittent numbness and tingling in her right

hand.  *Id.*  She reported that she was sometimes depressed.  *Id.*  She denied that she

suffered from chest pain, dyspnea, orthopnea, or palpitations.  *Id.*  On examination, Dr.

Sampson found no thyroidmegaly or adenopathy, but mild tenderness on Plaintiff's

anterior neck.  R. 320.  She had full dexterity of her hands, and sensation was within

normal limits.  *Id.*  Dr. Sampson found that Plaintiff could stand and walk on her heels

and toes, get up from a seated position without difficulty, and get up and off the

examination table without difficulty.  *Id.*  Her back was found to be without tenderness or

spasms, and the straight leg raising tests, sitting and supine, were negative.  *Id.*  Dr.

Sampson's impression was cardiomyopathy-exertional dyspnea, a history of goiter-

clinically euthyroid, hypertension, intermittent lower back pain, history of carpal tunnel

syndrome on the right, and poor visual acuity.  R. 321.

On September 19, 2007, Dr. Umana found Plaintiff to be feeling well overall.  R.

356.  She had no chest pain, edema, or orthopnea.  *Id.*

On October 22, 2007, Plaintiff was seen by Marie Hume Guilford, Ph.D., for a

consultative psychological evaluation.  R. 333.  The purpose was to determine the

nature and extent of any psychiatric disabilities.  *Id.*  She was driven to the examination,

asserting that she could no longer drive.  *Id.*  She was observed to walk with a slow,

unsteady gait.  *Id.*  Plaintiff said she did not know if she suffered depression, but she

said she was sad and cried a lot.  R. 334.  Plaintiff said that she had completed twelfth

grade and denied attending special education classes, but reported some learning

problems.  R. 334.  She said she could read.  *Id.*  Plaintiff had previously worked in

offices and grocery stores.  *Id.*  She said she could not hold objects on her right side.  R.

335.  She thought that she needed a wheel chair because she was having problems

moving around.  *Id*.

Plaintiff said she "sits around and watches the birds and looks at 'the beautiful

sky' during the day," and said that it is "dangerous nowadays."  R. 335.  She said that

she sometimes cooks her own meals, but apparently does not cook much.  *Id*.  She said

that she takes care of her personal hygiene, but is unable to complete household

chores.  *Id*.  She had a friend help her with grocery shopping.  *Id*.

Plaintiff reported that her concentration is poor, and that her ability to complete

short-term tasks is also poor because she easily becomes fatigued.  R. 335.  Dr.

Guilford thought that Plaintiff had "limitations in her ability to tolerate the stress of work."

*Id*.  She determined, however, that Plaintiff's problems "do not significantly impair her

ability to follow simple one or two-step instructions," but "do seem to affect her ability to

interact with others."  *Id*.  Dr. Guilford said that Plaintiff was "not able to maintain

attention and concentration," and "her pace is inadequate for most work settings."  *Id*.

Dr. Guilford thought that Plaintiff "cannot tolerate the stress of a routine workday and

adapt to change."  *Id*.

Dr. Guilford said that Plaintiff was "an emotional wreck throughout the interview.

She cried most of the time and more often than not it was impossible to figure out what

she was talking about."  R. 335.  Her attitude, however, was within normal limits.  *Id*.

Plaintiff's mood appeared to be depressed and she was overly emotional.  *Id*.  Dr.

Guilford found that Plaintiff's speech was childlike and difficult to understand, and

thought that Plaintiff had poor communication and social skills.  *Id*.  Dr. Guilford found

Plaintiff's thought processes to be "scattered and did not always make sense. It was hard to figure out what she was talking about." *Id*. Dr. Guilford determined that Plaintiff displayed "some paranoid thinking." *Id*.

Dr. Guilford said that Plaintiff's "educational background, reasoning, and vocabulary suggested that she is likely functioning in the deficient to borderline range of intelligence." R. 336. When Martin Luther King, Jr., was mentioned, Plaintiff started to cry hysterically and rambled about how the "babies are dying in the streets and they shouldn't be dying and if we don't help them they'll all be dying because when I was in school they brought knives and razors to school but now they bringing guns to school and killing each other and it's just not right." *Id*. Dr. Guilford said that Plaintiff's attention and concentration during the interview were poor. *Id*. She said that Plaintiff's recent and remote memory abilities were poor and she was a questionable informant. *Id*.

Dr. Guilford's impression was depressive disorder, NOS, rule out borderline intellectual functioning and rule out personality disorder, NOS. R. 336. Her prognosis was guarded. *Id*. Dr. Guilford thought that Plaintiff "presented as much more emotionally disturbed during this evaluation than during the medical evaluation in which she reported just occasional depression." *Id*.

On November 20, 2007, a non-examination state agency psychologist determined that while Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods and her ability to complete a normal workday and workweek without psychological interruptions or to perform at a consistent pace, she was not significantly limited in any other psychological ability. R. 352-353. The

evaluator, Thomas Conger, Ph.D., said he thought that while Plaintiff had some

concentration problems, she was mentally capable of performing simple, repetitive tasks

on a sustained basis.  R. 354.

There are no medical records for the next two years.  On October 2, 2009,

Plaintiff went to the emergency room complaining of right upper quadrant pain,

lightheadedness, falling, and some depression.  R. 368.  Plaintiff said that she had

experienced increased right upper quadrant pain since 2008.  *Id.*  She said that

dizziness had been intermittent, but she had passed out on the sofa that morning.  *Id.*

She said that in May, 2009, she passed out and fell to the floor.  *Id.*  On examination,

she was found to have profound anemia.  *Id.*  She was also examined by Dr. Mitchell, a

psychiatrist, who thought that she was clinically depressed and needed to be followed

up by psychiatry after her medical problems had been stabilized.  *Id.*  Plaintiff reported

that she experienced shortness of breath only when walking up hills.  *Id.*  She said that

she ached in her thighs and feet from time to time.  *Id.*  Plaintiff said that she had

stopped taking all of her medications in October, 2008, because they made her feel ill.

*Id.*  Plaintiff's lightheadedness was determined to have been caused by iron deficiency

anemia, though the source of the anemia was unclear.  R. 369.  A GI bleed was thought

to be a possible cause, but her blood loss was also thought to be slow and not acute.

*Id.*  It was speculated that there was some link between Plaintiff's anemia and her

hypothyroidism.  *Id.*  Plaintiff had not been taking levothyroxine[10] since the prior year,

---

[10] Levothyroxine is the generic name for products such as Synthroid.  Synthroid is a
synthetic hormone prescribed when the thyroid gland is unable to make enough
hormone. It is also used to treat or prevent the following: goiter (an enlarged thyroid
gland); certain thyroid cancers; or thyroid hormone deficiency due to surgery, radiation,

and she was started back on that medication.  *Id.*  It was expected that her TSH levels

would begin to fall back with this medication.  *Id.*  It was also thought that Plaintiff's

severe hypothyroidism was contributing to her depression, and that reversal of her TSH

levels would "improve her mentation and outlook on life."  *Id.*  It was thought that the

pain in Plaintiff's right upper quadrant was chronic and "a biliary or liver pathology . . .

may be contributing," although liver enzymes were normal.  *Id.*

**Legal analysis**

>  **Whether the ALJ erred at step 2 and failed to consider all of
>  Plaintiff's "severe" impairments in combination**

Plaintiff argues that the ALJ erred by not finding that she had the following

"severe" impairments: ongoing congestive heart failure, lower extremity edema, anemia,

and right hand cyst.  Doc. 18, p. 11.  Plaintiff further argues that the ALJ erred in not

considering these impairments in combination.  *Id.*

At step 2, the issue is whether Plaintiff has shown that she has a condition which

has more than "a minimal effect on her ability to:  walk, stand, sit, lift, push, pull, reach,

carry, or handle, etc."  Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying

on 20 C.F.R. § 404.1521).  "In other words, the 'severity' of a medically ascertained

disability must be measured in terms of its effect upon ability to work, and not simply in

terms of deviation from purely medical standards of bodily perfection or normality."

McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

"[I]n order for an impairment to be non-severe, 'it [must be] a slight abnormality

which has such a minimal effect on the individual that it would not be expected to

_____

or certain drugs.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

interfere with the individual's ability to work, irrespective of age, education, or work experience.' " Parker v. Bowen, 793 F.2d 1177, 1181 (11th Cir. 1986), *citing* Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984), Edwards v. Heckler, 736 F.2d 625, 630 (11th Cir. 1984), and Flynn, 768 F.2d at 1274.  "Step two is a threshold inquiry.  It allows only claims based on the most trivial impairments to be rejected.  The claimant's burden at step two is mild." McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) (clarifying Brady).  A "severe impairment" is a "de minimis requirement which only screens out those applicants whose medical problems could 'not possibly' prevent them from working." Stratton v. Bowen, 827 F.2d 1447, 1452 n. 9 (11th Cir. 1987), *quoting* Baeder v. Heckler, 768 F.2d 547, 551 (3d Cir. 1985).[11]

An erroneous finding as to "severe" impairments at step 2 may improperly foreclose a claimant's "ability to demonstrate the merits of her claim for disability with respect to her former work activities." Flynn, 768 F.2d at 1275.  Impairments must be evaluated in combination at all stages of the analysis.  20 C.F.R. §§ 404.1523 and 416.923; Lucas v. Sullivan, 918 F.2d 1567, 1574 (11th Cir. 1990); Swindle v. Sullivan, 914 F.2d 222, 226 (11th Cir. 1990); Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).  Impairments must be evaluated in combination even though some impairments are not severe.  Hudson v. Heckler, 755 F.2d 781, 785 and n. 2 (11th Cir. 1985).  The Eleventh Circuit has "repeatedly held that an ALJ must make specific and well-

---

[11] It also has been characterized by the Supreme Court as a criterion which identifies "at an early stage those claimants whose medical impairments are so *slight* that it is unlikely they would be found to be disabled even if their age, education and experience were taken into consideration." Stratton, 827 F.2d at 1452 n. 9 (emphasis by the court), *quoting* Bowen v. Yuckert, 482 U.S. 137, 153, 107 S.Ct. 2287, 2297, 96 L.Ed.2d 119 (1987).

articulated findings as to the effect of the combination of impairments when determining whether an individual is disabled."  <u>Davis v. Shalala</u>, 985 F.2d at 534.

At step 2, the ALJ found that Plaintiff's only "severe" impairments were hyperthyroidism, a "history" of congestive heart failure, degenerative disc disease, and mild depressive disorder.  R. 11.

Plaintiff first argues that the ALJ erred in finding that Plaintiff had only a "history" of congestive heart failure, rather than a "severe" impairment of ongoing congestive heart failure.  Plaintiff argues that testing to determine whether her heart condition would resolve with medication for her thyroid problem was postponed due to lack of medical insurance coverage.  Doc. 18, p. 12, citing R. 271.  Plaintiff argues that her physicians also thought that her cardiac abnormalities might be caused not only by thyroid misfunction, but by hypertensive heart disease.  *Id.*  Plaintiff argues that she "never was able to obtain the required testing."  *Id.*  Plaintiff argues from this that the ALJ erred in assuming that temporary resolution of Plaintiff's thyroid problem would resolve her cardiac impairment.  *Id.*  It is argued that in January, 2007, when she had cardiac testing, her ejection fraction was 20 to 30%, but "[b]ecause Plaintiff was never able to obtain additional testing, it is unclear whether her cardiac function improved substantially."  *Id.*, pp. 12-13.

Defendant notes that by October 2, 2009, Plaintiff's "congestive heart failure with an ejection fraction of 30% last recorded on echocardiogram in January of 2007" was listed as past medical history.  Doc. 21, p. 6, citing R. 368.  Defendant argues that this is correct as the evidence of congestive heart failure were the studies in early 2007.  *Id.*

It is true that this impairment was listed in "past medical history" in 2009, but so were hypothyroidism and hypertension.  R. 368.  The real problem here is a lack of more current testing.  Plaintiff seems to suggest that she did not have cardiac testing after the January, 2007, tests, because she did not have insurance coverage or the funds to pay for it, but that is not supported by the record.  Although Plaintiff had an ejection fraction of 20 to 30%, a sign of congestive heart failure, it was thought that some of this was due to hyperthyroidism that "she had likely had for a long period of time."  R. 256.  During the period from January 10, 2007, to January 18, 2007, Plaintiff declined cardiac catheterization because she was feeling better.  *Id.*  On January 31, 2007, Plaintiff again declined cardiac catheterization.  R. 275.  In August, 2007, tests showed that Plaintiff's thyroid was normal.  R. 357.  There are no medical records from November, 2007, to October, 2009.  On October 2, 2009, Plaintiff went to the emergency room for lightheadedness and was found to have severe anemia, not congestive heart failure.  R. 368.  She had not taken medications since October, 2008, not because she could not afford them, but because they made her feel ill.  *Id.*  Plaintiff had not been taking levothyroxine (Synthroid) since the prior year, and she was started back on that medication by the attending physician.  R. 369.  It was thought that this would help with her depression.  *Id.*

It summary, the ALJ simply said there was no evidence of current congestive heart failure, and that the only evidence was historic.   This finding is supported by substantial evidence in the record.  The ALJ did have substantial evidence in the record to conclude that it was possible that Plaintiff's heart problems were resolved or could be

resolved as her thyroid condition was resolved with medication.  There is no evidence to

the contrary, and no substantial evidence that Plaintiff could not have obtained some

sort of additional cardiac testing due to lack of funds.  The first point is not persuasive.

Plaintiff next argues that the ALJ erred in failing to find that Plaintiff had a

"severe" impairment of persistent edema.  Doc. 18, p. 13.  Plaintiffs legs were very

swollen on December 5, 2006 (R. 242).  However, Plaintiff's lower extremity edema was

absent on April 26, 2005 (R. 291), absent on January 13, 2007 (R. 268), occasional only

when standing a long time on January 31, 2007 (R. 275) and February 21, 2007 (R.

274), minimal on March 15, 2007 (R. 273), "no major trouble" on May 8, 2007 (R. 272),

improved on July 18, 2007 (R. 271), minimal on August 21, 2007 (R. 270 and 358),

absent on September 12, 2007 (R. 320), and absent on September 19, 2007 (R. 356).

The Administrative Law Judge's determination at step 2 that Plaintiff's edema was not a

"severe" condition is supported by substantial evidence in the record.  Further, the ALJ

adequately considered this condition, even if not severe, in limiting Plaintiff to sedentary

work.

Plaintiff argues that the ALJ erred at step 2 in failing to find that Plaintiff's anemia

was a "severe" impairment.  Doc. 18, p. 13.  Plaintiff's anemia, which occasionally

caused fatigue and lightheadedness, was twice treated with blood transfusions, once in

January, 2007, and once in October, 2009.  There is no evidence that her anemia did

not respond to treatment on those two occasions, and no evidence of persistent anemia

in the other encounters with physicians.  The ALJ did not err in failing to find this

condition to be a "severe" impairment, and he adequately accounted for this occasional problem by limiting Plaintiff to sedentary work.

Finally, Plaintiff argues that the ALJ erred in failing to note that sometime after carpal tunnel surgery, she had a tender cyst in her right wrist causing weakness. Doc. 18, pp. 13-14. On September 12, 2007, Plaintiff told Dr. Sampson that she had intermittent numbness and tingling in her right hand. R. 319. He found upon examination, however, that she had full dexterity of her hands, and her sensation was within normal limits. R. 320. It was not error for the ALJ to fail to determine that the cyst was a "severe" impairment or to further consider it in combination with other impairments.

In summary, this first argument is not persuasive. The ALJ's determination of the "severe" impairments at step 2 is supported by substantial evidence in the record, and he did not thereafter fail to consider them, as well as other medical problems, in combination.

### Whether the ALJ misread the functional assessment of Dr. Umana and erroneously rejected the opinion of Dr. Guilford

The Administrative Law Judge determined that "some weight is being given to the opinion of Dr. Umana, in that it reveals that the claimant was able to do some form of work activity for up to forty hours a week." R. 16. Plaintiff contends this was a misreading of Dr. Umana's opinion, and thus effectively a rejection of the opinion of a treating physician. Doc. 18, pp. 14-15.

Plaintiff contends that had Dr. Umana thought that Plaintiff could *work* 40 hours a week, he would have checked the "31-40 hours" box on the form. Doc. 18, p. 15, citing

R. 312.  Instead, he said that Plaintiff could work 11 to 20 hours.  Plaintiff also argues

that although Dr. Umana thought that Plaintiff could do activities other than work for 11

to 20 hours a week, other activities are not considered "gainful" employment by the

Commissioner and are not the same as work activity.  *Id.*

Defendant, on the other hand, contends that Dr. Umana's opinion as to the length

of time that Plaintiff might engage in "employment" and "activities" should be read as

additive, that he thought that Plaintiff could first work 11 to 20 hours a week and then

perform other significant activities, such as classroom work, volunteer work, and the

like, for 11 to 20 hours, for a total of 22 to 40 hours per week.  Doc. 21, pp. 6-7.  That is

apparently the assumption made by the ALJ.  R. 16.

The ALJ's decision in this regard is unreasonable.  Forms of this nature do not

ask whether a person can work or be engaged in significant activity for an 80 hour

week.  The standard is a 40 hour week.[12]  Yet, if the ALJ's construction were to be

---

[12] Social Security Ruling 96-8p provides in part that in determining residual
functional capacity:

> Ordinarily, RFC is the individual's maximum remaining ability to do
> sustained work activities in an ordinary work setting on a regular and
> continuing basis, and the RFC assessment must include a discussion
> of the individual's abilities on that basis.  A "regular and continuing
> basis" means 8 hours a day, for 5 days a week, or an equivalent work
> schedule.

S.S.R. 96-8p (footnote 2 omitted).  A footnote to this passage qualifies that the "8
hours a day, for five days a week" requirement only applies to an RFC determination
at Step 5:

> The ability to work 8 hours a day for 5 days a week is not always
> required when evaluating an individual's ability to do past relevant work
> at step 4 of the sequential evaluation process.  Part-time work that was
> substantial gainful activity, performed within the past 15 years, and
> lasted long enough for the person to learn to do it constitutes past

correct, Dr. Umana might have reached the opinion that Plaintiff had the ability to work 31 to 40 hours and then do classroom or volunteer work for 31 to 40 hours in the same week.

Further, the first sentence of paragraph 2 of this form reads: "A participant with an employment limitation <u>may still be able to work with limitations or be assigned to an</u> <u>activity that requires little physical strain or demand</u> (attending classes, volunteering, home study, answering telephones, filing while seated, etc.)."  R. 312 (emphasis on the form).  Thus, paragraph 2 of the form equates attending classes (an activity) and filing while seated (work, if for pay, or an activity, if volunteering) as one and the same.  The choices, "Employment" and "Activities," follow.  As he read the form, Dr. Umana would have seen that the form deemed work and activities to be equivalent, and then he was asked how long Plaintiff could "work" in a 40 hour week.  R. 312.  That question did not ask Dr. Umana to reserve some hours in the week for "activities."  Dr. Umana reasonably should have thought that he was being asked, at that point, how long in a 40 hour week can Plaintiff work?  He then would have passed to the same question for "activities."  There was no preface to that question to account for the hours "worked" before starting the "activities."  In other words, that section did not say, for example,

_____

relevant work, and an individual who retains the RFC to perform such work must be found not disabled.

S.S.R. 96-9p, footnote 2.  Dr. Umana's opinion, however, is a general residual functional capacity opinion, and not an opinion as to whether Plaintiff can do her former jobs.

"*Having worked the hours indicated above*, how many hours in the week could the person engage in activities."

In summary, Dr. Umana said that he thought that Plaintiff could work for 11 to 20 hours in a week, or engage in work-like activities for the same period. Since the form was misread, the record does not contain an adequate evaluation of the opinion of Dr. Umana by the ALJ. The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Winschel v. Commissioner of Social Sec., 631 F.3d 1176, 1179 (11th Cir. 2011). The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004). "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

A remand is needed to comply with this caselaw. On remand, the ALJ must assume that the opinion of Dr. Umana is not additive, and that Dr. Umana thought that Plaintiff could work only 11 to 20 hours a week. Alternatively, the ALJ may contact Dr. Umana and have him clarify the meaning of the opinion he expressed on this form.

Plaintiff also faults the ALJ's rejection of Dr. Umana's opinion (giving it only "some" weight) in favor of "substantial" weight to the opinion of consultant Dr. Sampson. Doc. 18, p. 16. The ALJ wrote: "[S]ubstantial weigh[t] is being given to the examination

of the claimant by Dr. Sampson, which reveals that the claimant has much greater

capability than she alleges."  R. 16.  Dr. Sampson expressed no opinion about Plaintiff's

"capability."  He did, however, make certain findings which the ALJ might have

mentioned as supportive of his conclusion that she had greater capability than she

claims.  Dr. Sampson found that Plaintiff had full dexterity of her hands, sensation was

within normal limits, she could stand and walk on her heels and toes, get up from a

seated position without difficulty, get up and off the examination table without difficulty,

her back was without tenderness or spasms, and the straight leg raising tests, sitting

and supine, were negative.  R. 320.  Dr. Sampson was not a treating physician,

however.  A consultative examination, that is, a one-time examination by a physician

who is not a treating physician, need not be given deference by the Commissioner.

McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987); Kirby v. Astrue, 500 F.3d 705,

709 (8th Cir. 2007) (a consulting physician's opinion "deserves no special weight").  The

opinion of a consultative physician, however, is still a medical opinion deserving of

consideration along with all of the other evidence.  Since a remand is needed, the ALJ

will have an opportunity to discuss Dr. Sampson's specific findings and to follow the law

governing the lesser weight to be afforded the opinion of a consultative physician.

Plaintiff also argues that the ALJ erred by giving "less weight" to the mental

health opinion of Dr. Guilford.  Doc. 18, p. 17.  The Administrative Law Judge said:

"Lesser weight is being given to the opinion of Dr. Guilford, for reasons explained

above."  R. 16.  The ALJ had reasoned earlier that Plaintiff had been inconsistent in her

reports to Dr. Guilford, first asserting that she could cook her own meals and take care

of personal hygiene, and then stating that she does not cook, has poor concentration

and ability to complete short-term tasks, and tires easily.  R. 15.  The ALJ also thought

that while Dr. Guilford determined that Plaintiff's attention, concentration, and pace were

inadequate, that she could not tolerate stress in the workplace, that she was an

emotional wreck and exhibited paranoid thinking, and that her recent and remote

memory was poor, she testified that she had worked temporarily in data entry office

jobs, had excellent memory at the hearing, and had a twelfth grade education without

needing special classes.  R. 15-16.  The ALJ determined that Plaintiff had presented to

Dr. Guilford "in a manner that is inconsistent with her presentation at the hearing and to

other doctors and examiners of record."  R. 16.  Dr. Guilford made the same

observation, noting that Plaintiff "presented as much more emotionally disturbed during

this evaluation than during the medical evaluation in which she reported just occasional

depression."  R. 336.

   While credibility determinations are well-within the authority of an administrative

law judge during a hearing, a medical judgment as to whether Plaintiff suffers from

depression or other mental deficit as she sits there is not.  Of course, a lay person is

competent to judge whether a person is responsive, maintains focus, and apparently

comprehends during a hearing, but the *medical* evidentiary value of these short

observations, by a person without medical training, is slight.  In the Eleventh Circuit, it is

not appropriate for the Administrative Law Judge, who is not a medical expert,

subjectively to arrive at an index of traits which he expects the claimant to manifest at

the hearing, and then to deny the claim when such traits are not observed.  Freeman v.

Schweiker, 681 F.2d 727, 731 (11th Cir. 1982).[13]

Likewise, the ALJ's rejection of Dr. Guilford's opinion for lack of notations

elsewhere in the medical record as to Plaintiff's mental status is not supported by

substantial evidence in the record.  Dr. Guilford's observations of Plaintiff's mental

status on October 22, 2007, is consistent with several observations by physicians.  Dr.

Guilford found Plaintiff to be childlike.  On admission to the hospital on January 10,

2007, Plaintiff was found to be "very childlike in nature."  R. 260.  When she presented

for emergency treatment on November 6, 2006, she was "teary eyed and crying at

triage."  R. 245.  When admitted to the hospital for a blood transfusion for anemia on

October 5, 2009, Plaintiff was found to have suicidal ideations, in need of psychiatric

care, and was "tearful and emotional."  R. 369.  Further, as to other medical notes,

Plaintiff presented to medical doctors for treatment of her physical maladies, not for

mental health treatment, and there was little reason for those physicians to carefully

note her mental status.

It is true, however, that Dr. Guilford's examination presented several unanswered

questions.  Dr. Guilford herself noted that the extreme presentation she encountered

---

[13]  The Eleventh Circuit has termed this "sit and squirm jurisprudence," and forbids that this method of analysis be used.  McRoberts v. Bowen, 841 F.2d 1077, 1081 (11th Cir. 1988); Johns v. Bowen, 821 F.2d 551, 557 (11th Cir. 1987); Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984).  It is proper, however, for the ALJ to consider the claimant's demeanor and appearance during the hearing as long as this is not in lieu of consideration of the medical evidence presented.  Norris v. Heckler, 760 F.2d 1154, 1158 (11th Cir. 1985); Macia v. Bowen, 829 F.2d 1009, 1011 (11th Cir. 1987).  "We do not accept an ALJ's mere reliance on his observation of a claimant during a hearing as the only basis upon which to reject a claimant's reference to pain."  Norris, 760 F.2d at 1158.

with Plaintiff was not the same in degree as reflected elsewhere in the medical record.

She also had questions about Plaintiff's intellectual capabilities.  There are tests for

exaggerations and intellectual ability that Dr. Guilford could have performed.  Since this

case should be remanded for consideration of Dr. Umana's opinion that she can work

no more than 11 to 20 hours, if needed, the ALJ should obtain further mental status

testing to clarify these issues.

### Whether the ALJ erred in finding that Plaintiff had past relevant work

As noted earlier, the ALJ determined at step 4 that Plaintiff had past relevant

work as a hand packager and as an office clerk routine.  R. 16.  Relying upon evidence

from a vocational expert, he the determined that Plaintiff could still do this past relevant

work.  R. 16.

Plaintiff contends that this was error because these jobs do not qualify as past

relevant work.  Do. 18, p. 19.  Plaintiff argues that the regulation provides:

> (1) *Definition of past relevant work.*  Past relevant work is work that you
> have done within the past 15 years, that *was substantial gainful activity*,
> and that lasted long enough for you to learn to do it. (See §404.1565(a).)

20 C.F.R. § 404.1560(a)(1) (emphasis added).  The Commissioner has a table showing

the level of earnings which are considered to be "substantial gainful activity."  20 C.F.R.

404.1574(b)(2) and POMS DI 10501.015 attached to doc. 18.  The regulation states that

if a claimant's average monthly earnings:

> are equal to or less than the amount(s) determined under paragraph (b)(2)
> of this section for the year(s) in which you work, we will generally consider
> that the earnings from your work as an employee (including earnings from
> work in a sheltered workshop or comparable facility) will show that you
> have not engaged in substantial gainful activity.

20 C.F.R. 404.1574(b)(3)(i).  However, information other than average monthly earnings

may be considered.  For example, the Commissioner may consider whether the

claimant's work "is comparable to that of unimpaired people in your community who are

doing the same or similar occupations as their means of livelihood, taking into account

the time, energy, skill, and responsibility involved in the work."  20 C.F.R.

404.1574(b)(3)(ii)(A).

Defendant does not argue that the hand packager job for Goodwill could be

considered past relevant work.  Doc. 21, p. 10.  It will be assumed, therefore, that

Defendant concedes error as to that job as past relevant work.

Instead, Defendant argues that the Manpower job of office clerk, routine, was

"substantial gainful activity" when judged by the earnings test.  *Id.*  The average monthly

earnings threshold for substantial gainful activity was $500 for the years 1990 through

June, 1999, and was $700 for the period July, 1999, through December, 2000.  20

C.F.R. 404.1574(b)(2)(ii)(B).  Defendant points out that Plaintiff said that in the years

1995 to 2000, she earned $6.00 an hour, 8 hours a day, 5 days a week at the

Manpower clerical jobs.  R. 173.  Assuming that one works 20 days in a month, this

results in a putative average monthly rate of $960 a month, sufficient to show that this

job was substantial gainful activity using the average monthly earnings test.  Defendant

points out that while these jobs were temporary, lasting anywhere from a few weeks to

five months, they were full-time jobs when Plaintiff was working in them.

Plaintiff contends that her average monthly earnings while working in the

Manpower jobs were lower than the thresholds specified in the regulation and POMS DI

10501.015.  Plaintiff relies upon her FICA wages as reported.  R. 163-164.  In the year 2000, she had only $1,623.13 in wages from Manpower International, Inc.  R. 163.  She then divides these annual earnings by 12 to get an average monthly wage.  Doc. 18, pp. 20-21.  The result is indeed lower than the thresholds in the regulations.  *Id.*

Plaintiff's mathematical method is not reasonable, however.  There is no evidence in this record as to the number of months that Plaintiff worked for Manpower to earn the annual wages reported.  If there were such evidence, the task would be to divide the wages by the months, or portions thereof, actually worked.  Jaramillo v. Astrue, 2009 WL 4722251, *5 (E.D. N.Y. Dec 9, 2009) (No. 08-CV-2837 (ARR)) ("An applicant's earnings must be averaged over the time period during which he worked."); Carter v. Apfel, 2000 WL 360222, *2 (S.D. Ala. Mar 14, 2000) (No. CIV.A.98-1185RVS) (same); Deignan v. Shalala, 1994 WL 585929, *9 (D. R.I. Jun 9, 1994) (No. 93-0416L) (same).

This method makes sense.  As noted above, the focus is upon whether Plaintiff's past work was "comparable to that of unimpaired people in your community who are doing the same or similar occupations as their means of livelihood, taking into account the time, energy, skill, and responsibility involved in the work."  20 C.F.R. 404.1574(b)(3)(ii)(A).  Dividing the annual earnings by 12, as Plaintiff has done understates the effective monthly earnings that Plaintiff enjoyed, albeit for only temporary work, and unreasonably devalues the work that she did.  A wage of $6.00 per hour, when earned on a full-time basis for a period of time as long as five months, is substantial gainful activity because it is comparable to the work of unimpaired people

when measured by the average monthly earnings test for the earnings year.  The ALJ

did not err in determining that Plaintiff had past relevant work in the job of office clerk,

routine.

### Whether Plaintiff's limitation to simple, one-step tasks should have been presented to a vocational expert in a hypothetical

The ALJ limited Plaintiff to simple, routine, repetitive tasks.  R. 13.  He then

determined that Plaintiff's additional limitations, including the limitation to simple,

routine, repetitive tasks, have "little or no effect on the occupational base of unskilled

sedentary work."  R. 17.  Thus, he relied upon the "grids" to determine whether there

was other work which Plaintiff could do.

Plaintiff argues that a limitation to simple, routine, repetitive tasks significantly

reduces the unskilled sedentary occupational base and precludes reliance upon the

"grids."  Doc. 18, pp. 21-22. Plaintiff contends that the vocational expert should have

been consulted at step 5.  *Id.*, p. 22.

On remand it is unclear whether the ALJ will reach step 5 of the analysis.  If he

gives substantial weight to Dr. Umana's opinion, or determines that Dr. Guilford's

opinion is worthy of substantial weight, it is likely that step 5 will not be reached.  But if it

is, the court's ruling on this issue would be helpful.

"The general rule is that after determining the claimant's RFC and ability or

inability to return to past relevant work, the ALJ may use the grids to determine whether

other jobs exist in the national economy that a claimant is able to perform."  Phillips v.

Barnhart, 357 F.3d 1232, 1142 (11th Cir. 2004).  "[E]xclusive reliance on the grids is not

appropriate either when [a] claimant is unable to perform a full range of work at a given

residual functional level or when a claimant has non-exertional impairments that significantly limit basic work skills." *Id.*, *quoting* Francis v. Heckler, 749 F.2d 1562, 1566 (11th Cir. 1985).

In Vuxta v. Commissioner of Social Sec., 194 Fed.Appx. 874 (11th Cir. Sep 8, 2006) (not selected for publication in the Federal Reporter, No. 06-11768), the ALJ had found that Plaintiff was limited to "simple and repetitive work," but determined that she was limited to only "unskilled work" in his residual functional capacity assessment. 194 Fed.Appx. at 877. Plaintiff contended that:

> . . . the ALJ was required to find whether the restriction to simple, repetitive work impacts her ability to perform a wide range of jobs at the light, unskilled level. She further argues the ALJ erroneously relied exclusively on the medical-vocational guidelines (grids) in determining there were jobs available in the national economy she could perform.

*Id.*

Vuxta noted the well-established rule that exclusive reliance upon the grids is not appropriate "*either* when the claimant is unable to perform a full range of work at a given residual functional level or when a claimant has non-exertional impairments that significantly limit basic work skills." *Id.*, at 878, *quoting* Phillips v. Barnhart, 357 F.3d 1232, 1242 (11th Cir. 2004) (emphasis by the court in Phillips).

> "This Court has interpreted 'significantly limit basic work skills' as limitations that prohibit a claimant from performing 'a wide range' of work at a given work level" *Id.* at 1243. "The ALJ must make a specific finding as to whether the nonexertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations." Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995) (quotation omitted).

*Id.* Vuxta noted that the ALJ had determined that the claimant's exertional residual

functional capacity was for light work and "her nonexertional RFC was for unskilled

work." *Id.* The ALJ then relied upon the grids to find that the claimant was not disabled.

*Id.*

The court then made a distinction between a limitation to perform simple tasks

and a limitation for repetitive tasks. The court said that a simple tasks limitation means

a limitation to do only unskilled work, and thus the ALJ did not err using the grids as to

that limitation. *Id.* The court then said:

> If the ALJ determined that a limitation to repetitive tasks did not preclude
> Vuxta from performing a wide range of work at a given level, then a
> disability determination relying exclusively on the grids was appropriate.
> If, however, the ALJ determined that a limitation to repetitive tasks
> significantly limited Vuxta's basic work skills, then the ALJ was required to
> consult a VE [vocational expert]. The ALJ must address and resolve this
> issue before relying on the grids.

*Id.* The issue was remanded for further consideration. *Id.*

As noted above, the ALJ here determined that the limitation to simple, routine,

repetitive tasks had "little or no effect on the occupational base of unskilled sedentary

work." R. 17. Thus, this case seems to fit the first category identified by Vuxta.

However, in Coffin v. Commissioner of Social Sec., 2011 WL 806674, *8 (M.D. Fla. Mar

2, 2011) (No. 6:09-CV-2061-ORL-DAB., where the ALJ made the same terse finding,

the court remanded so that the ALJ could better explain why a limitation to repetitive

and routine tasks would not preclude a wide range of work at the given exertional level.

Since remand is recommended here for other reasons, that course of action is

recommended here. The ALJ should better explain why a limitation to simple, routine,

repetitive work does not preclude a wide range of sedentary work.  I make this recommendation fully aware that had the vocational expert been asked to express an opinion at step 5 as to the existence of jobs that Plaintiff might due with at the residual functional capacity assigned by the ALJ (limited to simple, routine, repetitive work), he probably would have identified a number of such jobs.  *E.g.*, <u>Young v. Barnhart</u>, 362 F.3d 995, 1004 (7th Cir. 2004).

> **Whether the ALJ erred in his finding that Plaintiff's testimony was not credible**

This analysis depends upon the ALJ's analysis of the medical evidence, and especially upon the weight to be given to the opinions of Dr. Umana and Dr. Guilford. After those issues are reconsidered, the ALJ should, if needed, determine the weight to be given to Plaintiff's testimony as to the extent of her impairments.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge were not based upon substantial evidence in the record and did not correctly follow the law.  The decision of the Commissioner to deny Plaintiff's application for benefits should be reversed and the case be remanded for further consideration.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to

deny Plaintiff's application for Social Security benefits be **REVERSED** and the case be

**REMANDED** for reconsideration of the issues identified above.

**IN CHAMBERS** at Tallahassee, Florida, on May 11, 2011.


s/     William C. Sherrill, Jr.
WILLIAM C. SHERRILL, JR.
UNITED STATES MAGISTRATE JUDGE


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**